**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| AIR LINE PILOTS ASSOCIATION, | ) | |
| INTERNATIONAL, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:18-cv-05089 |
| | ) | |
| v. | ) | |
| | ) | |
| FRONTIER AIRLINES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF AND PETITION TO CONFIRM ARBITRATION AWARD

Plaintiff Air Line Pilots Association, International ("ALPA") brings this action seeking injunctive, declaratory, and other appropriate relief against Frontier Airlines, Inc. ("Frontier" or the "Company") for violations of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-188. ALPA also seeks to confirm an arbitration award under the RLA.

In the face of a neutral labor arbitrator's finding that Frontier made material misrepresentations about its finances and bargained in bad faith with ALPA, and despite years of industry-leading profitability, Frontier has continued to flout its judicially-enforceable RLA obligation to make and maintain agreements with ALPA. It has thumbed its nose at the RLA-mandated arbitration remedy and made a mockery of the collective bargaining process. Despite ALPA's and ALPA pilots' established success in negotiating pilot labor agreements with dozens of carriers, including other "ultra low-cost" carriers with business models similar to Frontier, ALPA and the Frontier pilots have endured many months of fruitless efforts to negotiate with Frontier's obstructionist and punitive management. ALPA now therefore brings this action to enforce the arbitrator's ruling and obtain injunctive relief requiring Frontier to meet its obligations under the RLA – relief which only this Court may grant.

Specifically, ALPA seeks an order and judgment of this Court confirming, enforcing and ordering a remedy for the August 7, 2017 Award of the Frontier Airlines System Board of Adjustment ("System Board" or the "Board"), concluding that Frontier, which persists in paying its pilots bottom of the industry rates despite its industry leading profits, failed to negotiate in good faith over pilot compensation after Frontier exceeded contractual profit metrics mandating such negotiations. ALPA also seeks an order compelling Frontier, in accordance with its obligations under the RLA, to bargain in good faith with ALPA over rates of pay, rules, and working conditions of Frontier pilots, which it has thus far failed to do, and to otherwise cease its course of bad faith conduct undermining the RLA bargaining process and ALPA as the exclusive representative of the Frontier pilots.

## PARTIES

1.      ALPA is an unincorporated association organized for the purposes and objectives of a labor union with headquarters at 1625 Massachusetts Avenue, N.W., Washington, D.C. 20036, and 535 Herndon Parkway, Herndon, Virginia 20170. ALPA is the exclusive collective bargaining representative of the Flight Deck Crew Members employed by Frontier within the meaning of the RLA, 45 U.S.C. §§ 151 Sixth and 181 (the "Frontier pilots"). ALPA's functions as the exclusive collective bargaining representative of the Frontier pilots are coordinated by a governing body called the Frontier Master Executive Council ("Frontier MEC"). ALPA brings this action on behalf of itself and as the bargaining representative of the Frontier pilots.

2.      ALPA is the successor by merger to the Frontier Airlines Pilot Association ("FAPA"). In 2016, the Frontier pilots approved a merger with ALPA in a secret ballot election. As discussed below, FAPA and Frontier entered into a collective bargaining agreement governing terms and conditions of pilot employment that would become amendable in 2011,

later extended to March 2017 with a pilot option to open the agreement for renegotiation in March 2016 (the "Frontier CBA").

3.        Frontier is a "common carrier by air" engaged in the business of providing air services in interstate commerce within the meaning of the RLA, 45 U.S.C. § 181.    Its headquarters are 4545 Airport Way, Denver, Colorado.  Frontier is a wholly owned subsidiary of Frontier Group Holdings, Inc. ("Holdings").  Indigo Partners, LLC ("Indigo") is the principal shareholder of Holdings.  As such, Indigo indirectly owns and controls Frontier.  Frontier has a pilot and flight attendant crew base and maintains associated facilities within this judicial district at O'Hare International Airport.  As such it operates in and through this judicial district.

## JURISDICTION AND VENUE

4.        This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 because this action arises under the RLA, a federal statute regulating commerce.

5.        Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1), as Frontier resides in this judicial district within the meaning of 28 U.S.C. § 1391(c)(2), and 45 U.S.C. § 153 First (p), as Frontier operates through this judicial district.

## FACTUAL BACKGROUND

### Frontier's 2008 Bankruptcy and Pilot Concessions

6.        In April 2008, Frontier filed for protection under Chapter 11 of the Bankruptcy Code.  In June and again in September 2008, the Frontier pilots entered into concessionary agreements to support the airline's reorganization.  Specifically, the pilots agreed to wage cuts in in June 2008 and reductions in 401(k) plan contributions just a few months later in September 2008.  The parties also agreed to extend the Frontier CBA's amendable date, i.e., the date when either party could trigger negotiations to modify the agreement pursuant to Section 6 of the RLA,

45 U.S.C. § 156, to March 2015.  Frontier emerged from bankruptcy in October 2009 through its acquisition by a subsidiary of Republic Airways Holdings, Inc. ("Republic").

<u>Frontier's 2011 Financial Crisis and Further Pilot Concessions in LOA 67</u>

7.      In 2011, Frontier faced renewed financial distress and the prospect of a second Chapter 11 reorganization.  The pilots agreed to yet another concessionary Letter of Agreement, including 53 million dollars in wage and other benefit concessions.  This concessionary LOA included an additional extension of the Frontier CBA's amendable date from March 2015 to March 2017 with a pilot option to serve a Section 6 notice and re-open negotiations one year early in March 2016.  The concessions also included a deferral of pay rate increases otherwise due on July 1, 2011 and January 1, 2012, until January 1, 2016 and January 1, 2017, but with an understanding that there could be an earlier snapback in pay rates to prior book rates should Frontier earn a pre-tax profit margin above 5% in one year (this condition would affect only the scheduled January 1, 2016 increase) and above 5% in two consecutive years (this condition would affect the scheduled January 1, 2017 increase).  These commitments were contained in Letter of Agreement 67 executed in June 2011 ("LOA 67").

8.      Also, in LOA 67, the parties agreed to a further provision, paragraph A.3, which states: "In the event the reinstatement of pay in A.2 is effective prior to January 1, 2017, the Company and the Association agree to negotiate in good faith for further upward pay adjustments based on business conditions."

9.      When the parties reached agreement on paragraph A.3 above, they contemplated that negotiations for a new collective bargaining agreement might be underway when that provision was triggered.  As noted above, ALPA had the option of serving notice pursuant to Section 6 of the RLA, 45 U.S.C. § 156, in March 2016.

10.     In 2013, Indigo acquired control of Frontier.  Indigo is no stranger to the airline industry.  In 2010 it owned and controlled Spirit Airlines when its pilots exhausted the RLA bargaining process and lawfully struck the carrier for 5 days after failed negotiations.  The 2010 Spirit strike is the most recent strike of U.S. airline pilots.

11.     Paragraph A.3 of LOA 67 was triggered in the Spring of 2016 because Frontier experienced two successive years when its pre-tax profit margin exceeded 5%.  In 2014, it was 14.1% and it rose to 16.9% in 2015.  Also, at roughly the same time, *i.e.*, March 2016, the pilots exercised their option to open negotiations under Section 6 of the RLA one year early, as was their contractual right under LOA 67.  In notifying Frontier that the negotiation provisions of LOA 67 had been triggered, ALPA made a proposal to adjust the pay rates in April 22, 2016.

<u>Frontier's Bad Faith Bargaining in LOA 67-Related Negotiations</u>

12.     After ALPA made its LOA 67 wage proposal, the parties met on May 10, 2016 in connection with the ongoing Section 6 negotiations.  When queried about when ALPA could expect a response from management, the Company responded that it would present a written response later that week.  However, Frontier did not present a proposal to ALPA that week, nor did the Company make a proposal during a bargaining session that occurred on June 6-7, 2016.

13.     The parties met again in joint session on June 28-30, 2016.  The Company initially indicated to ALPA that it was still working on a LOA 67 proposal.  On June 30 Frontier's bargaining committee made a PowerPoint presentation to ALPA.  The presentation reported inaccurately that the Company faced "challenging business conditions" and falsely claimed that Brexit, terrorism and generally challenging conditions, among other things, prevented pay improvements for the pilots.  At the end of the presentation Frontier stated that it was unable to entertain any LOA 67 pay increases.  ALPA requested a copy of the Frontier's

PowerPoint presentation, and the Company refused to provide it. ALPA also requested information supporting various assertions in the Company's PowerPoint presentation, and Frontier refused to provide such information except for a one-page copy of its fleet plan.

14.     Also, on June 30, 2016, the Company said that if ALPA were willing to entertain certain concessions in connection with vacation, the company would use the savings generated by the concessions to increase pilot wages. This proposal, if adopted, would have resulted in a wage rate less than the snapback rate scheduled to take effect in early 2017. ALPA asked the Company if this proposal was their LOA 67 proposal. Frontier said that it was not and that the Company did not have any LOA 67 proposal.

15.      Thereafter, ALPA requested from the Company financial information, such as an audited financial statement, fleet plan, long-term business plan, balance sheet, and cash flow statements not available by reference to publicly available Department of Transportation filings. The Company refused to provide this information except for the one-page fleet plan.

16.     On August 8, 2016, ALPA filed a grievance alleging that Frontier breached its LOA 67 obligation to bargain in good faith for wage increases given its strong financial performance in 2014 and 2015. Frontier denied the grievance. ALPA advanced the case to the System Board. The parties agreed to and appointed labor arbitrator Lawrence T. Holden to serve as the neutral member of a three-person System Board otherwise composed of a Company and ALPA representative.

<u>The Holden Award</u>

17.     The Board sustained ALPA's grievance by Opinion and Award dated August 7, 2017 (together, the "Holden Award"). The Opinion is Attachment A to this Complaint; the Award is Attachment B. In determining what the contractual requirement of bargaining in good

6

faith means, the Board distinguished between surface bargaining – "going through the motions of bargaining without a sincere attempt to resolve issues" and genuine bargaining, which necessarily involves a willingness to make reasonable efforts to reach an agreement. Attachment A at 17.

18.     The Company's unwillingness to make a proposal to respond to ALPA's April 2016 demand for an interim wage rate increase through to the June 30 presentation showed, as the Board found, that Frontier was going through the motions without any intent of seeking a resolution.  Attachment A at 18-19.  As the Board found: "[t]he foregoing does not reveal any reasonable effort on the Company's part to explore ideas and potential solutions with the Association in a genuine attempt to reach a mutually satisfactory outcome[.]" Attachment A at 19.

19.     In concluding that Frontier had failed to bargain in good faith, the Board also found that the Company's PowerPoint presentation did not "accurately reflect prevailing business conditions for the Company" and was "highly unbalanced and misleading". Attachment A at 19.  Frontier claimed that its financial circumstances were so dire that it could not offer increased compensation.  Attachment A at 18-19.

20.     The Board concluded, instead, that "there were far more positives than negatives" in Frontier's financial condition, pointing to the substantial operating margins that triggered LOA 67 bargaining in the first place, "payment of bonuses to management pilots in 2016 ranging from $13,061 to $50,573" and upstreaming of dividends in excess of $100 million a year in 2016 and 2017 to Indigo.  Attachment A at 20.

21.     Similarly, the Board found that Frontier's refusal to provide ALPA with the PowerPoint presentation or supporting data and information ALPA reasonably requested showed

bad faith. The Board noted that this is especially so because "it is the case that the power point presentation is highly unbalanced and misleading[.]". Attachment A at 19.

22.     In its August 7 Award, the Board ordered Frontier to bargain in good faith under the precepts set out in the Opinion as required by LOA 67. Specifically, the Award provides:

1.  The Company has violated Par. A.3 of LOA 67.

2.  Both parties have an obligation to bargain in good faith pursuant to the precepts contained in the accompanying decision and pursuant to the requirements of Par. A.3 of LOA 67 and are ordered to do so.

Attachment B.

23.     The Board retained jurisdiction for 45 days "for the purpose of resolving any dispute arising out of the remedy ordered herein." Attachment B.

24.     The Board's retained jurisdiction then lapsed.

25.     Frontier has not sought judicial review of the Award. The findings of the System Board in the Holden Award are conclusive, final and binding on the parties.

26.     Frontier has not complied with the Holden Award. It has never made a proposal that would increase compensation from the time LOA 67 bargaining was triggered.

27.     In October 2017, after the Holden Award issued, management offered a 1.5% prospective pay increase conditioned on ALPA withdrawing its proposal for an increase effective April 2016 when Frontier was obligated to bargain in good faith over increased pilot compensation under LOA 67. ALPA rejected this proposal but made a counter offer. Frontier has never responded.

28.     The Company has, despite the Holden Award, continued to refuse to bargain in good faith over pilot compensation as required by LOA 67. Frontier's refusal to comply with the Holden Award, coupled with its other bad faith conduct in negotiations and multiple unilateral,

punitive changes to pilot working conditions (all outlined below), signal to the Frontier pilots the futility of the RLA collective bargaining process and undermine ALPA in the eyes of the pilot group.

Frontier's Bad Faith Bargaining Beyond the LOA 67 Negotiations:<br>
According to Management, 'Poking the Bear' [Frontier Pilots] is Fun

29.     Beyond its adjudicated failure to bargain in good faith as required by LOA 67, Frontier's other conduct – both before and after the Holden Award issued -- reveals that it is more interested in provoking the Frontier pilots than in making every reasonable effort to resolve differences with ALPA and reach a revised labor agreement, as the RLA requires.

30.     Frontier management's internal communications show its intent.  On September 7, 2017, a month after the Holden Award issued, management posted on its internal website a memo to the pilot group concerning planning and operational recovery given Hurricane Irma's progress towards Florida.  The version of the memo initially published permitted viewers to see editorial revisions and comments management made to an earlier draft, including an editorial comment from one manager indicating "poking the bear is fun.".  Management removed the draft memo with the comments from the website within hours.  But before it did so, pilots saw the management comments revealing the Company's stated amusement and enjoyment in "poking the bear," *i.e.*, antagonizing ALPA and the pilots, rather than collaborating with ALPA to reach a collective bargaining agreement.

31.     Frontier's bad faith pre-dates the Holden Award and has continued throughout the protracted RLA Section 6 negotiations period.  The totality of its conduct shows that Frontier is not interested in reaching agreement with ALPA.  Rather, from the outset management's conduct has signaled to the Frontier pilots the futility of collective bargaining and served to undermine ALPA in the eyes of the pilot group.

### The Company's Refusal to Agree to a Customary Protocol Agreement

32.     At the outset of Section 6 bargaining in early 2016, FAPA proposed that the parties enter into an agreement establishing the procedural framework for the talks.  These industry-standard protocol agreements identify dates, times and locations for negotiations, as well as outlining topics to be considered at various meetings.  ALPA and other unions customarily enter into similar agreements addressing such framework issues with airline management because they organize and streamline the process.

33.     After weeks of discussion in the late winter and early spring of 2016, Frontier refused to agree to procedural terms for the negotiating process, including the time, dates and places for future negotiating sessions.  Frontier also refused to provide additional paid leave for members of the Frontier MEC Negotiating Committee to prepare for and participate in the discussions, despite having provided similar accommodation in the past.

### Management Shell Games and Delay Tactics Stall Bargaining

34.     It is customary in pilot labor negotiations that the parties develop, at the outset, parallel "costing" models so that the economic cost (or savings) generated by a particular proposal can be estimated and confirmed by both parties.  To this end, at the outset of negotiations ALPA sought Company data and information necessary to build such a model.  Contrary to the negotiating practices at virtually every other ALPA represented carrier, the Company denied that building a costing model was important, delayed responding to requests for necessary information or provided non-responsive and incomplete material for many months until the National Mediation Board assigned a mediator to the negotiations.

35.     After ALPA constructed a costing model, and at the mediator's direction, the Company's Vice President of Finance started to build such a model and requested and received

ALPA's help to construct it in April 2017. In many meetings concerning construction of the model, Company representatives reported that ALPA's input had been helpful, and the Company produced roughly approximate costing results using that model. ALPA therefore reasonably and in good faith believed that Frontier would finalize its own costing model in a way that was similar to ALPA's and consistent with industry practice.

36. The mediator advised the parties that a session scheduled for September 17 through 28, 2017, was intended to resolve all remaining open issues in the negotiations. At the time of the September 2017 meetings, a year and a half had passed since ALPA served its Section 6 notice. More than a month had passed since the System Board found that Frontier had negotiated in bad faith over pilot wage issues triggered by its profitability in 2014 and 2015. That profitability continued into 2016: Frontier's pre-tax margin for 2016 was 18.4%, even higher than the previous two record-setting years. Frontier paid in excess of $100 million in dividends to Indigo in early 2017.

37. Frontier, however, did not move efficiently to resolve the open economic issues; rather, it engaged in further delay tactics signaling that it has no intention of reaching agreement. Management arrived at the September meeting with an entirely different costing model from that developed in discussions with ALPA. The mediator insisted on returning to the previous costing methods and comparisons. Predictably, the September sessions ended without agreement on economic issues.

38. Frontier repeated its costing charade at the next mediation session held in Washington on November 27-29, 2017. At the Washington meetings, the Company, without prior notice or explanation, revised the costing method yet again. This time it used the economic costs of Frontier's most highly paid pilots rather than the costs of an average pilot to value

11

proposals. Needless to say, this method produced a higher valuation than did ALPA's industry standard model using average pilot costs.

39. Management also claimed that the value of its proposals made that day represented an increase from its previous economic proposal – the customary way of evaluating changes. This was false. After being questioned by ALPA, Frontier only later clarified that the increase was from current contract costs, not its last economic proposal.

<u>Management "Bait and Switch" Tactics Further Stall Bargaining,<br>Demonstrating Bad Faith</u>

40. In June of 2016, the Company proposed that ALPA entertain a preferential bidding system ("PBS") to replace the existing line bidding system that awards pilot schedules. The negotiation, design and implementation of a PBS is a significant undertaking in that it is foundational to how the pilots' schedules are determined. ALPA responded that neither the pilot group nor the Frontier MEC was likely to support moving to PBS from its current line bidding system, but that a meaningful proposal in conjunction with LOA 67 could potentially help the parties find common ground to understand whether a framework for that discussion could be established. As stated above, Frontier refused to make any LOA 67 proposal.

41. The Company acknowledged the difficulty of transitioning to PBS and stated that it would instead consider modifications to the line bidding system, as well as changes to contract provisions governing the assignment of pilots to open positions (vacancies), that the Company identified as important. Frontier did not raise PBS again until February 2018.

42. After mediation commenced, and at the mediator's urging, in the fall of 2016 management identified specific steps that would increase pilot productivity and achieve operational and administrative efficiencies as its key goals for the negotiation.

43.    Between fall 2016 and the end of 2017, ALPA ultimately agreed to 25 changes valued at $200 million in cost reductions that would result in 6.47 more hours flying per pilot per month, well in excess of a 5-hour target Frontier management had set.

44.    Frontier responded by moving the goal posts.  Notwithstanding its stated position that each of these 25 items was "important," only after ALPA tentatively agreed to them, *i.e.*, an agreement subject to a final resolution of all outstanding issues, management suddenly took the position that many of the 25 had zero or very little economic value.  Consequently, the better part of a year was wasted trying to hit a non-existent target with months of pointless debate over the value of the items.

45.     In negotiations on February 22, 2018, after having acknowledged that discussion of PBS was not likely to be fruitful, not discussing it for a year, and seeking and obtaining substantial other changes in lieu of PBS, Frontier again proposed a PBS scheduling system.

More Regressive Bargaining

46.    The Company's conduct during negotiations related to Benefits and Training Issues has also been regressive.  For some period of time, Frontier refused to provide ALPA with copies of the plan documents governing the pilot health and retirement plans, and only did so after ALPA reminded Company representatives that pilot participants have a legal right to copies of the plan documents.  After management finally provided the documents, a revolving door of different Frontier personnel have attended negotiations to discuss benefits issues, but none were able to answer key basic questions related to the pilots' 401(k) or long-term disability plans, with the same benefits representative never returning a second time to the next bargaining session at which those issues were discussed.  Eventually Frontier's Vice President of Finance assumed

responsibility for benefits issues, but his lack of knowledge concerning the subject again produced substantial delay.

47.     In September 2017, the parties eventually reached tentative agreements on various matters in the insurance and retirement areas.  However, in a negotiating session on February 2, 2018, management reneged on some of those tentative agreements, including agreements on the Company information provided to ALPA for semi-annual benefits meetings, and the total contribution amount required from pilots.  Only after these closed matters were again discussed during several subsequent sessions did the Company finally agree to close out previously closed items.

48.     Similarly, in mediation conducted in Chicago between February 28 and March 2, 2017, ALPA and management reached a tentative agreement concerning how flight simulators would be used for training and checking purposes.  At the next mediation session Frontier reneged on that agreement.  This closed matter was again discussed over several further sessions before a second tentative agreement was reached.

<u>Despite Being Found to Have Negotiated in Bad Faith, Frontier Has Undertaken a Series of Retaliatory Changes in Pilot Working Conditions</u>

<u>Imposed Dependability Policy Threatens New Bases for Pilot Discipline</u>

49.     On July 9, 2018, Frontier flight operations management advised that it intended to implement a "Dependability" policy which could provide new bases for potential pilot discipline for a variety of issues.  The Company had no such policy in place for its pilots before the announcement.  This new unilaterally-imposed policy changes pilot working conditions and was not raised by management during discussion of relevant provisions of the Frontier CBA in the negotiations, and ALPA did not agree to it.  The new policy changes three separate collectively-bargained provisions.  Frontier raised none of these changes in bargaining.

14

50.     The first unilateral disciplinary change is to Section 15 of the Frontier CBA, which governs Sick Leave.  It provides for accrual of sick leave time and places a cap on the number of sick days a pilot may bank at any time.  It does not place any limit (other than the cap) on how much sick leave time a pilot may use.  Nor does it (or any other provision of the Frontier CBA) contain an attendance system that would subject pilots to discipline for absenteeism, including use of sick leave time.

51.     On November 28, 2017, an Agreement in Principle was reached by the parties regarding Section 15, Sick Leave, with a change in the way that sick time could be made up in the new contract rather than the more extensive changes earlier proposed by management.   The parties both indicated that the Sick Leave provision was closed.  Frontier management did not then (or at any time in bargaining) state that it wished to define acceptable limits (by incident or frequency) of sick leave usage.

52.     The second change unilaterally imposes policies which could result in discipline relating to pilot absences due to commuting delays.  A pilot's flight duty begins and ends at their domicile (assigned pilot base).  But many Frontier pilots do not live near their domiciles.  They commute by air from their homes to their domiciles to report for duty.

53.     The Frontier CBA addresses issues relating to commuting in Section 2.J ("Prudent Judgment Policy").  Pilots who are unable to report as scheduled to their domicile (or other reporting place) because of an interruption in travel plans are required to notify crew scheduling as soon as possible.  Pilots who commute by air must attempt to obtain travel as specified by that section of the Frontier CBA.

54.     Pilots who follow the policy are not subject to discipline unless there has been a pattern of inability to report on time.  The Frontier CBA does not define what would constitute such a pattern, by number of incidents, frequency or otherwise.

55.     Section 2.J was also discussed in bargaining.  Management made no proposal to change any aspect of that provision.

56.     The third unilateral disciplinary change is to Section 5.S.5 of the Frontier CBA, under which certain reserve pilots are required to be available to be contacted by Frontier crew scheduling for assignment only during their reserve duty period.  If a pilot is not immediately available for contact, he or she must return call(s) from crew scheduling within 10 minutes after the last telephone number called by crew scheduling or they will be marked as Unable to Contact ("UTC").

57.     The Frontier CBA does not define the number or frequency of UTC incidents that would subject a pilot to discipline.  The parties have discussed reserve staffing extensively during the negotiations.  At no time has management proposed to define by number or frequency UTC incidents that would subject pilots to discipline.

58.     The new "Dependability" policy limits the frequency of sick leave, prudent judgment absences and UTC incidents.  As noted above, Frontier management has not proposed such a policy in negotiations, and none of these "dependability" items were raised, much less agreed to, in the on-going negotiations.

59.     On information and belief, coincident with the new "Dependability" policy, management issued warning letters to many pilots for attendance issues.  Management sent warning letters to pilots who had made their Chief Pilots aware of surgeries or other serious

illness, and who had previously been assured that there would be no consequence for their absences.

<u>Newly Imposed Policy Threatens Discipline Concerning Minimum Monthly Pay Credit</u>

60.     Under Section 5.L.3 of the Frontier CBA, a pilot must have a minimum of 70 hours of pay credit at the completion of each monthly bid period.  Until July 3, 2018, management had not enforced this provision of the agreement for at least five years.  During negotiations in June 2017, management indicated that it did not intend to revise this practice and would only enforce the requirement if a pilot was not close to the minimum.  Management did not propose to define by either number of bid months, frequency or otherwise when failure to meet the 70-hour minimum would warrant discipline.

61.     Suddenly, on July 3, 2018, Frontier sent letters to nine pilots who it contends had not met the Section 5.L.3 minimum for the June 2018 bid month and demanded that those pilots provide a written explanation of why they (allegedly) failed to do so.  Each of the letters recites that a future unexcused failure to meet the requirements would lead to discipline.

62.     In addition, Frontier sent similar threatening warning letters to an additional thirteen pilots for their alleged failure to credit 70 hours in months going back to January 2018.  These pilots have either had investigatory disciplinary interviews, in which they were threatened that further failure to reach 70 hours could be the basis for discipline or discharge, or have been scheduled to have such investigatory disciplinary interviews.

<u>Frontier's Mass Vacation Cancellations, Retaliatory Refusal to Permit ALPA To Represent Probationary Pilots, And Other Punitive Behavior Designed to Pressure and Inflame Pilots</u>

63.     On July 5, 2018, Frontier management announced in a memorandum to all pilots that the Company will cancel approximately half of the scheduled August 2018 pilot vacations.

These cancellations would involve Captains and First Officers in each of the Company's four pilot domiciles.

64.    The Company asked pilots willing to cancel their vacations to volunteer to do so by the following Monday, July 9.  In the event insufficient volunteers came forward the Company advised that it would involuntarily cancel pilot vacations in reverse order of seniority.

65.    On July 10, 2018, management advised that the scheduled August vacations of 141 pilots were cancelled.  All but one of these cancellations were involuntarily imposed by management.

66.    Frontier did not give ALPA prior notice of, or seek to discuss with the union, its announcement concerning vacation cancellations.  ALPA representatives learned of the mass cancellation of August vacations at the same time the Frontier pilots did.

67.    The Company has caused substantial tumult in pilots' personal lives. Traditionally, many pilots plan time off in August to spend time with family, given school schedules.  Pilots with wedding plans and pre-purchased family vacations now face the cancellation of those significant life events.  Frontier's failure to alert ALPA to its intentions left the union unable to respond to the concerns raised by members.

68.    On July 11, 2018, ALPA received a letter from Frontier management indicating that if ALPA wished to continue to represent probationary Frontier pilots at disciplinary hearings, it must sign a list of commitments and waivers to do so.  ALPA refused to sign the waiver on the basis that the longstanding practice was that ALPA participated in such hearings. Despite the Chief Pilot having advised one of the probationary pilots scheduled for a hearing that he should bring union representation, Frontier prevented ALPA from representing several Frontier probationary pilots at disciplinary hearings on July 12, 2018.

69.     Frontier operates Airbus 319, 320, and 321 aircraft.  For some time, Airbus operators, including Frontier's pilots and cabin crew members, have detected fumes which cause nausea, vomiting, and eye irritation.  When these events began occurring at Frontier, pilots were excused from duty until they could recover (usually just a day or two), and without the company charging the pilot's sick bank.  Starting in July 2018, the Company has removed pilots involved in a fume event from active status, regardless of whether the pilot is reporting symptoms, and docking their sick banks for flying missed, in violation of the clear terms of the collective bargaining agreement.

70.     To protect its rights and without prejudice to ALPA's legal position in this matter, ALPA has grieved, pursuant to the dispute resolution procedures of the parties' CBA, the unilateral working condition changes described in Paragraphs 49-69 above.

71.      Despite being previously found by a neutral to have negotiated in bad faith, Frontier has acted with impunity in unilaterally imposing punitive working condition changes, so as to further "poke the bear" to pressure and inflame its pilots during bargaining and to retaliate against them and their chosen representative on account of their bargaining position.

72.     Frontier's unilateral, punitive course of conduct, as described above, has been undertaken in bad faith, and is calculated to undermine the RLA bargaining process and make the Frontier pilots' chosen representative appear ineffective.

## COUNT I
### (ENFORCEMENT OF THE HOLDEN AWARD)

73.     ALPA realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 72 above as if fully set forth herein.

74.     Pursuant to Section 3, First (p) of the RLA, 45 U.S.C. § 153 First (p), a petition may be brought to enforce an arbitration award and, in any such proceeding, the findings and

conclusions of the panel shall be conclusive on the parties and upon entry of relief, and petitioner shall be entitled to reasonable attorney's fees and costs. Section 3, First (p) has been applied by the Seventh Circuit Court of Appeals to decisions of System Boards of Adjustment in the airline industry. *See Assoc. of Flight Attendants v. Republic Airlines*, 797 F.2d 352 (7th Cir. 1986).

75.     Frontier was obligated by the Holden Award to bargain in good faith over increased pilot compensation under LOA 67. It has failed and refused to do so. ALPA is entitled to judgment enforcing the Holden Award under Section 3, First (p) of the RLA.

## COUNT II
## (VIOLATION OF RLA GOOD FAITH BARGAINING OBLIGATIONS)

76.     ALPA realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 75 above as if fully set forth herein.

77.     Frontier is obligated under Section 2 First, Second, Third and Fourth, of the RLA, 45 U.S.C. § 152 First, Second, Third, Fourth, to treat, confer, and bargain exclusively and in good faith with ALPA with regard to rates of pay, rules, and working conditions for all employees in the class or craft of Frontier pilots represented by ALPA and with regard to all disputes between Frontier and its pilots, as represented by ALPA. Frontier is further obligated under these statutory provisions to make every reasonable effort to make agreements with ALPA concerning rates of pay, rules, and working conditions, to maintain such agreements, and to consider expeditiously and settle all disputes between Frontier and its pilots, as represented ALPA.

78.     Frontier, by its course of conduct described above, has failed and refused to treat, confer, and bargain exclusively and in good faith with ALPA, to make every reasonable effort to make and maintain agreements with ALPA, or otherwise to negotiate in good faith with ALPA, and to make every reasonable effort to consider and settle all disputes with regard to rates of pay,

rules, and working conditions of Frontier pilots for whom ALPA is the exclusive bargaining representative under the RLA. This course of bad faith conduct evidences that Frontier has no sincere intent to reach an agreement with ALPA and is in violation of the obligations imposed on Frontier by Section 2 First, Second, Third, and Fourth of the RLA, 45 U.S.C. § 152 First, Second, Third, and Fourth.

79.     Frontier's course of conduct, as described above, constitutes a failure and refusal to bargain in good faith with ALPA concerning rates of pay, rules, and working conditions, in violation of Frontier's statutory obligations under Section 2 First of the RLA, 45 U.S.C. § 152 First.

### COUNT III
### (VIOLATION OF RLA ORGANIZATIONAL PROTECTIONS)

80.     ALPA realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 79 above as if fully set forth herein.

81.     Frontier is obligated under Section 2 First, Third, and Fourth of the RLA, 45 U.S.C. § 152 First, Third, and Fourth, to refrain from interfering with, undermining, subverting, or destroying ALPA's status and effectiveness as the collective bargaining representative of the Frontier pilots.

82.     By refusing to bargain in good faith as described above with ALPA and by unilaterally implementing punitive changes to pilot working conditions during bargaining as described in Paragraphs 1 - 81, above, Frontier has intentionally interfered with, undermined, and subverted any semblance of a good faith RLA bargaining process, and in so doing, has attempted to make ALPA appear ineffective in the eyes of the Frontier pilots, undermining ALPA's status and effectiveness as the collective bargaining representative of Frontier pilots.

By doing so, Frontier has denied Frontier pilots their legal rights, in violation of Section 2 First, Third, and Fourth of the RLA, 45 U.S.C. § 152 First, Third, and Fourth.

83.    Frontier's course of conduct, by undermining the RLA bargaining process and ALPA as described above, is destructive of the representative standing and legitimate effectiveness of ALPA as the exclusive collective bargaining representative of Frontier pilots and of the rights of the Frontier pilots to organize and bargain collectively through their designated representative, without interference, influence, or coercion by Frontier, in violation of Section 2 First, Third, and Fourth of the RLA, 45 U.S.C. § 152 First, Third, and Fourth.

84.    Frontier, by undermining the RLA bargaining process and ALPA through its course of conduct described above, has undertaken to interfere with, undermine, subvert, and destroy ALPA's status and effectiveness as the collective bargaining representative of the Frontier pilots, in violation of Section 2 First, Third, and Fourth of the RLA, 45 U.S.C. § 152, First, Third, and Fourth.

## APPROPRIATENESS OF EQUITABLE RELIEF

85.    By the conduct described above, Frontier has caused, and is continuing to cause, irreparable injury to ALPA and the Frontier pilots it represents.  Frontier will continue to engage in this unlawful course of conduct unless enjoined.

86.    ALPA has fully complied with all obligations under the Frontier CBA and the RLA and has exhausted all available administrative and contractual remedies.

87.    ALPA has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, ALPA respectfully requests that this Court issue the following relief:

1.    Judgment:

(a) Confirming the Holden Award, finding and concluding that Frontier violated its obligation under LOA 67 to negotiate increased pilot compensation and enjoining Frontier to do so;

(b) Enjoining, ordering, directing, and requiring Frontier and its directors, officers, agents, and employees, to recognize and treat exclusively with ALPA as the collective bargaining representative for Frontier pilots and to make every reasonable good-faith effort to bargain with, make and maintain agreements, and settle all disputes with ALPA with respect to the rates of pay, rules, and working conditions of all Frontier pilots; and

(c) Enjoining, ordering, directing, and requiring Frontier and its directors, officers, agents, and employees, to refrain from interfering with, undermining, subverting, or destroying ALPA's status and effectiveness as the collective bargaining representative of the Frontier pilots.

2. A judgment pursuant to 28 U.S.C. §§ 2201 and 2202 declaring the rights of the parties.

3. A judgment awarding additional relief, as determined by the Court, including monetary relief, as may be appropriate to fully remedy the violations of the RLA by Frontier and its infringement of the rights of the Frontier pilots, as represented by ALPA.

4. Such other and further relief as this Court may deem appropriate, including reasonable attorneys' fees and the costs ALPA has incurred in bringing this proceeding pursuant to Section 3 First (p) of the RLA, 45 U.S.C. § 153 First (p).

23

Dated:  July 25, 2018

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL**

By: /s/  Rami N. Fakhouri
    Rami N. Fakhouri
    GOLDMAN ISMAIL TOMASELLI BRENNAN
    & BAUM LLP
    564 W. Randolph St., Suite 400
    Chicago, IL 60661
    Tel.:  (312) 681-6000
    Fax:  (312) 881-5191
    rfakhouri@goldmanismail.com

Jonathan A. Cohen
Marcus C. Migliore (*Pro Hac Vice pending*)
Air Line Pilots Association, Int'l
1625 Massachusetts Avenue NW
Washington, DC 20036
(202) 797-4000
marcus.migliore@alpa.org
jonathan.cohen@alpa.org

Thomas N. Ciantra (*Pro Hac Vice pending*)
Air Line Pilots Assoc., Int'l
535 Herndon Parkway
Herndon, VA 20170
Tel:  (703) 481-2468
thomas.ciantra@alpa.org