# ATTACHMENT A

In The Matter Of

The Arbitration Between:

**Air Line Pilots Association, International**
**And**
**Frontier Airlines, Inc.**

Direct Appointment by the Parties
LOA 67 Grievance; Griev. No. 16-08-0082
Date of Opinion: August 7, 2017

<u>Preliminary Statement</u>

Arbitration hearings involving the above-captioned matter were held on April 20 & 21, 2017 in Denver, Colorado before a System Board of Adjustment comprising Gerardo Arellano, Company-designee, Brian Ketchum, Association-designee, and the undersigned, impartial chairman. Representing the Company at such hearings was Patrick R. Scully, Esq., and representing the Association was Matthew E. Babcock, Esq.. A transcript of the hearings was made; both parties filed post-hearing briefs which were received by the undersigned on June 30, 2017.

<u>Issues</u>

The parties agreed to submit the following issues for decision; they are: "Whether the Company has violated Par. A.3 of LOA 67? If so, what shall be the remedy?"

<u>Background</u>

This case implicates Par. A.3 of LOA 67, executed in June 2011, which provides, in essence, that in the event certain conditions precedent are fulfilled, the parties will "negotiate in good faith for further upward pay adjustments based on business conditions". The Association asserts that the Company has not fulfilled its obligation

to negotiate in good faith on pilot pay adjustments pursuant to LOA 67, and the Company denies such allegation. Hence arises this case.

The background is as follows. The existing collective bargaining agreement between the Association[1] and the Company went into effect in March 2007 with an amendable date in March 2011. That agreement contained no pay increases for pilots in its first three years; thereafter, it provided for modest pay increases in March 2010 and March 2011.

In April 2008 Frontier Airlines filed for Ch. 11 bankruptcy protection.

In June 2008 the Association and Frontier executed letter of agreement (LOA) 17 wherein the Association agreed to a 14.5% pilot wage cut through September 2008 and further agreed to a reduction in Company contributions to pilot 401k plans. Thereafter, the foregoing concessionary pay cuts were extended through December 2008 (LOA 20).

In December 2008 the Association and Frontier agreed to a gradual reduction in the concessionary pay rates but extended the time for a return to the contractually specified (book) rates to July 1, 2011 in the case of the March 2010 increase and to January 1, 2012 in the case of the March 2011 increase.

In 2009 Republic Airways Holdings purchased Frontier Airlines out of bankruptcy.

In 2011 Frontier Airlines was back under financial duress and was at risk of another Ch. 11 bankruptcy filing or Ch. 7 liquidation. Bryan Bedford, CEO of Republic, and Scott Gould, lead negotiator for the pilots, decided to attempt an out-of-court restructuring. The negotiators ultimately agreed upon 53 million dollars in wage and other benefit concessions from the pilots; upon an extension of the collective bargaining agreement's amendable date from March 2015 to March 2017 with a pilot option to re-open negotiations one year early in March 2016 if the pilots chose to do so; a grant to existing pilots

---

[1] There have been changes in pilot representation since 2016. Initially the pilots were represented by the Frontier Airline Pilots Association, and now they are represented by the Air Line Pilots Association, International. The term "Association" is used generically, and it is meant to reference the organization representing the pilots at a particular point in time.

collectively of a 4% equity interest in the Company which would be held by a trust, FAPA Invest; and a deferral of the July 1, 2011 and January 1, 2012 pay rate increases until January 1, 2016 and January 1, 2017 but with an understanding that there could be an earlier snapback in pay rates to book rates should Frontier earn a pre-tax profit margin above 5% in one year (this condition would affect only the scheduled January 1, 2016 increase) and above 5% in two consecutive years (this condition would affect the scheduled January 1, 2017 increase). This commitment was contained in LOA 67 executed in June 2011.

Also, in LOA 67, the parties agreed to a further provision, Par. A.3, which is the subject of the dispute in this case. Par. A.3 provides:

"In the event the reinstatement of pay in A.2 is effective prior to January 1, 2017, the Company and the Association agree to negotiate in good faith for further upward pay adjustments based on business conditions."

The uncontroverted evidence was that when the parties reached agreement on Par. A.3 above, they did contemplate that Sec. 6 negotiations for a new collective bargaining agreement might be underway when A.3 was triggered.

It turned out that Par. A.3 was triggered in the Spring of 2016 because the Company experienced two successive years when its pre-tax profit margin exceeded 5%. Also, at roughly the same time, i.e., March 2016, the pilots exercised their option to open Sec. 6 negotiations one year early as was their contractual right.

Jacalyn Peter, Vice-President of Labor Relations, testified about the commencement of Sec. 6 negotiations in March 2016. She informed the Association's negotiating committee that "we expect to pay you more, but we have to achieve … productivity increases". The Sec. 6 negotiations have continued concomitantly with the LOA 67 negotiations and have been difficult, to say the least, according to Ms. Peter. She reported that the Association bargainers told her that "You're going to pay us, and you're going to pay us big and we are not going to change … our work rules. Our work rules are sacred, and that's just

3

how it's going to be, so get over it." She also testified that a nasty epithet was hurled at her during Sec. 6 negotiations. The Association bargainers testified that the parties have made some progress on minor points in the Sec. 6 negotiations including work rule changes and that the Association has been willing to discuss productivity and efficiency issues.

In April 2016 the Association presented to the Company its pay proposal pursuant to Par. A.3 of LOA 67. The Association viewed its proposal as a bridge until new pay rates could be negotiated in Sec. 6 bargaining. The Association sought a pay increase for pilots valued at 28 million dollars.

On May 17, 2016 the Company responded to the Association's pay proposal in part as follows:

"It is the Company's intent to honor its obligation under LOA 67 A.3 to 'negotiate in good faith for further upward pay adjustments based upon business conditions.' However, given that Section 6 negotiations are underway, an evaluation of 'business conditions' must include an evaluation of all proposed pay, work rule, and benefit changes to the CBA that could affect the Company's performance. Therefore, in order to expedite the A.3 process, please provide us, at your earliest convenience, with the Association's proposals in these areas."

On May 19, 2016 the Association replied in part as follows:

"Good faith negotiations under LOA 67 are not tied to the amendable date of the Frontier-FAPA agreement, have nothing to do with the early opening of the FAPA-Frontier CBA, and don't relate to other contract issues that may be discussed, as they always are in Section 6, or outside of it.

"Instead, further upward pay adjustments under LOA 67 are keyed fully to 'business conditions' – which are generally understood to mean financial or economic circumstances as they relate to corporate performance. It's clear that the conditions surrounding Frontier's business have improved exponentially and will condition (sic) to do so based on virtually all airline financial reports. Revenue is up, fuel costs are down, and load factors are high. Frontier has one of the highest margins in the airline industry.

"The Association specifically proposed an interim LOA 67 pay rate that would be effective only during the time that we were negotiating and prior to any increased contract costs. Consequently, your suggestion that the Company had to first understand and evaluate 'all proposed pay, work rule, and benefit changes to the CBA that could affect the Company's performance' makes no sense. There are no other contract cost increases incurred during the time that our proposed LOA

4

67 pay rate is in place, and the Company is able to make a proposal without the impact of any other increased costs…."

The parties met in joint session on June 6 & 7, 2016. The Company informed the Association that at that time it had no LOA 67 proposal to offer.

The parties met again in joint session on June 28-30, 2016. The Company initially indicated to the Association that it was still working on a LOA 67 proposal. On June 30th the Company's bargaining committee made a power point presentation to the Association. The presentation centered around the challenging business conditions the Company said it faced. Jim Nides on behalf of the Company's bargaining committee ended the presentation with the statement that the Company was unable to entertain any LOA 67 pay increases at that time. The Association requested a copy of the Company's power point presentation, and the Company refused to provide it at that time. The Association also requested information/data which supported various assertions in the Company's power point presentation, and the Company refused to provide such information/data except for a one page copy of its fleet plan.

Also, at some point on June 30, 2016, the Company said that if the Association made a concession on vacation pay, it would put the money saved from vacation pay back into the pilot wage rate. This proposal would have resulted, if adopted, in a wage rate less than the snapback rate scheduled to take effect in early 2017. The Association asked the Company if this proposal was their LOA 67 proposal, and Mr. Nides said it was not, and that the Company did not have a LOA 67 proposal. Thus ended the parties' June 28-30, 2016 bargaining session.

Thereafter, the Association requested from the Company financial information, such as an audited financial statement, fleet plan, long-term business plan, balance sheet, and cash flow statement not available by reference to DOT Form 41 filings. The Company refused to provide this information except for a one page fleet plan.

In a July 6, 2016 newsletter to its membership the Association'S MEC stated in part:

"Data from the U.S. Department of Transportation (DOT) show that Frontier posted a profit of $129 million in 2014 and $114 million in net income for the 9-month period ending in September 2015."

The newsletter further contained a quote from Frontier's CEO Barry Biffle:

"It's an exciting time for the company. We've made more money in the last 10 months than we've made in the previous 10 years combined."

The newsletter also stated:

"DOT Form 41 … shows that Frontier Airlines enjoyed a 2014 profit margin of … 15% improving to … 18% in 2015. These numbers far exceeded the 5% annual pre-tax profit margin threshold negotiated by FAPA as part of LOA 67 which triggered the early pay rate snapbacks we received in April 2015 and 2016."

In a July 8, 2016 newsletter to its membership the Association's MEC stated in part:

"Because Frontier is privately held, the company is not subject to the same financial reporting requirements the government demands from public companies that issue stock. This makes it more difficult, but not impossible, to fully determine how much money the airline is actually earning….

"Each month, Frontier management provides the Association with a spreadsheet detailing the previous month's income data for every Frontier pilot. The Association is entitled to this information to validate the duesable income of each pilot. The February 2016 data reflected substantial spikes associated with income reported for management pilots, who received lump sum payments ranging from $13,061 up to $50,573, averaging in excess of $30,000 each….

"While our owners pay bonuses to management, pilots continue to wait for our share of Frontier's success. LOA 67 burdened pilots with $55 million more in concessions with the promise that the pilot group would receive a return on that investment, including upward pay rates, when the Company became consistently profitable.

"Frontier pilots held up their end of the bargain but the Company is failing miserably at holding up their end. Our mission is to force management to keep their promises by giving us our fair share of what we are owed under LOA 67."

On August 8, 2016 the Association filed the class action grievance which led to this case. The grievance essentially alleges that the Company has failed to comply with its good faith bargaining obligation contained in LOA 67.

During the arbitration hearings in this case Kye Johanning, ALPA's Manager of the Economic and Financial Analysis Department, gave testimony supported by graphs and other data that Frontier was in a very positive place with regard to many financial metrics, with regard to its competitors in the ultra low cost carrier (ULCC) market, and with regard to legacy carriers in general. Bonuses had been granted to named executive officers, and dividends in the amount of 108 million dollars in 2016 and 165 million dollars in 2017 had been paid to shareholders including FAPA Invest (the pilot trust). Mr. Johanning testified that granting the pilots their LOA 67 proposal – a 28 million dollar pay increase – would drop the Company's pre-tax profit margin from 18.4% to 16.6%.

In March 2017 Frontier, a privately held company, made a Form S-1 filing[2] with the SEC in preparation for a public stock offering.

Inasmuch as the Association's grievance has remained unresolved, the Association has brought this grievance to arbitration for resolution.

<u>Position of the Parties</u>

<u>Position of the Association</u>

The Association contends that the Company has violated its duty to negotiate in good faith over "further upward pay adjustments based on business conditions" as that obligation is set forth in Par. A.3 of LOA 67. The Association says that the above bargaining obligation was triggered because the snapback in pay referenced in Par. A.2 of LOA 67 became effective prior to January 1, 2017, and that such event activated the bargaining obligation contained in Par. A.3 of LOA 67. The Association says that the bargaining obligation contained in Par. A.3 requires both parties to negotiate in good faith over a pay increase for pilots.

---

[2] The S-1 filing does contain a trove of financial information concerning the Company's operations.

The Association argues that both parties had a common understanding at the bargaining table as to what the bargaining obligation contained in Par. A.3 meant. Association negotiator Scott Gould testified that the intent of Par. A.3 was "to require that - that the Company and Association would negotiate in good faith for further upward pay adjustments; that was a requirement". Company negotiator and then-CEO Bryan Bedford agreed that if Par. A.2 were satisfied, then the "Company would be obligated to bargain, in good faith, an upward pay adjustment to pay rates based on business conditions".

The Association says that in April 2016 it submitted an interim pay proposal and that the Company has failed since then to negotiate over an interim pay increase. The Association says that Captain Gould understood that in the Par. A.3 negotiations the parties would "sit down and, in those negotiations, review the financial status of the Company, review the conditions in the industry at the time, and, in negotiation, take those into consideration in coming to a fair adjustment to the pay rates".

The Association says that the Company wants to link the Par. A.3 negotiations to the existing Sec. 6 negotiations which relate to bargaining over a new labor agreement. The Association says that the Par. A.3 negotiations relate to a pay rate for the interim period until the effective date of a new labor agreement.

The Association argues that the Company has repeatedly acted in bad faith in response to the Association's attempt to negotiate an interim pay increase. The Association says that over the course of two months in May and June 2016 the Company led the Association to believe that the Company was genuinely interested in reaching an agreement on an interim pay increase inasmuch as Ms. Peter wrote: "It is the Company's intent to honor its obligation under LOA67 A.3 to negotiate in good faith for further upward pay adjustments based upon business conditions". The Association says that the Company followed up on Ms. Peter's pledge with repeated assurances at negotiating sessions in May and June 2016 that the Company was working on a pay proposal to present to the Association. The Association says that at a late June

8

2016 negotiating session the Company told the Association that it was unable to pay for an interim wage increase and then in a letter dated March 28, 2017 stated that it was unwilling to pay for an interim wage increase.

The Association says that the Company has misled the Association about its business conditions. The Association says that at a late June 2016 meeting the Company made a presentation purporting to demonstrate that business conditions were deteriorating and stated at the end of that presentation that it was "unable to entertain" an interim pay increase for pilots. The Association argues that this portrayal of the Company's business conditions was false and misleading.

The Association references the detailed financial analysis of the Company's business condition presented by its expert witness, Kye Johanning, wherein Mr. Johanning testified that in his opinion the Company could afford a 28 million pay increase without undermining its business model. The Association further references Mr. Johanning's testimony wherein he stated that given what is known about the strength of the Company's financial condition in 2015 and 2016, it was not plausible that the Company could believe its financial condition was deteriorating. The Association points out that in its S-1 disclosure filed with the SEC, the Company confidently noted that its "business model … positions <the airline> to benefit from growth opportunities in the United States".  The Association further says that the Company's arguments that its market position was weaker than other ULCCs is highly misleading and that while the Company cites Allegiant's 62% market share, that claim ignores the fact that Allegiant flies in markets where nobody else flies. The Association argues that there was not a single slide in the Company's presentation to it in June 2016 that substantiated that the Company was being adversely affected by business conditions.

The Association says that in early July 2016 it requested financial information from the Company so that it could get a comprehensive portrait of the Company's financial situation and could determine whether or not the Company was able to afford an interim pay

increase. The Association says that such information was not provided to it. The Association says that an employer's duty to furnish information to substantiate a claim of inability to pay is well-settled; the Association cites the <u>Truitt</u> case wherein the US Supreme Court stated that "good faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some proof of its accuracy."

The Association says that the Company has refused to be transparent and to comply with its duty to provide relevant financial information and has further refused to provide any of the requested financial information except for a one page copy of its fleet plan. The Association argues that this is evidence of bad faith bargaining.

The Association points out that the Company does not believe its employees are unproductive since it states in its S-1 filing that it has a "highly productive workforce" which it identifies as one of its competitive strengths. The Association says that the Company's S-1 filing makes clear that business conditions justify pay increases but only for certain employees in that the Company paid bonuses ranging from $96,497 to $270,790 to named executive officers and also paid dividends to its shareholders of 108 million dollars in 2016 and 165 million dollars in 2017 based on the Company's "financial condition, operating results, contractual restrictions, capital requirements and business prospects".

The Association says that the Company has walked away from the bargaining table in violation of its good faith obligation to make a counterproposal when it rejected the Association's proposal as unsatisfactory. The Association says that good faith bargaining does not permit one party to walk away from the bargaining table leaving the other party in the position of countering its own proposal as happened here. The Association says that the Company's proposal in June 2016 to fund a pay increase based upon a pilot concession which would fund such increase does not constitute good faith bargaining.

The Association further says that such proposal had nothing to do with LOA 67 bargaining per the Company's own admission. The Association says that refusal to submit proposals or counterproposals is an indication of bad faith bargaining.

In sum, the Association asks that its grievance be granted; that the Company be ordered to provide the Association with information necessary to evaluate the Company's business condition including the information requested in the Association's July 8, 2016 letter; that an interim pay adjustment retroactive to April 1, 2016 with interest be ordered; that the Company be ordered to reimburse the Association for the costs involved in prosecuting the present grievance; that such further relief as the Board deems appropriate be ordered; and that the Board retain jurisdiction over the implementation of any remedy ordered herein.

Position of the Company

The Company contends that the System Board has no authority to alter LOA 67 by adopting the Association's definition of business conditions, by imposing a particular outcome in negotiations (i.e., an upward pay adjustment), by requiring the Company to provide financial or other data to the Association, by providing the pilots a retroactive pay increase, or by awarding litigation costs.

The Company further contends that it has not violated Par. 3 of LOA 67 in this case. In particular, the Company says that the Association carries the burden of proving by a preponderance of the evidence that the Company violated Par. 3 of LOA 67 and further says that the Association has not established such a violation in this case.

The Company argues that the language of Par. 3 of LOA 67 is clear and unambiguous on its face, and that it does not require the Company either to make a proposal for a pay adjustment or to agree to a proposal for a pay adjustment regardless of the Company's business conditions. The Company points out that its position is entirely consistent with the testimony of the Association's witness, Bryan

11

Bedford. The Company says that the Association's grievance is essentially an attempt to compel the Company to agree to a further pay increase for pilots beyond the snapbacks that have occurred.

The Company says, in particular, that Pars. A.1 and A.2 of LOA 67 require it to make specific pay adjustments for pilots based on specific profitability benchmarks, but that Par. A.3 is devoid of any language requiring the Company to agree to further pay increases and that Par. A.3 permits it to cite its own understanding of "business conditions" as a reason for refraining from offering further pay increases. The Company says that its only obligation under Par. A.3 is to negotiate with the Association in good faith on further pay increases.

The Company argues that the Association may not rely on unexpressed intentions behind the negotiation of LOA 67, and that any claim by the Association that business conditions are only relevant in negotiating the quantum of a pilot pay increase is incorrect.

The Company says that even if Par. A.3 is ambiguous on its face, which it is not, the Association has not presented evidence indicating that the parties agreed that the Company would be required to grant pay increases for pilots or that the Company would be prohibited from citing business conditions as a basis for refusing pay increases. The Company says that no evidence suggests that Par. A.3 was negotiated for the purpose of requiring the Company to grant a pay increase to pilots when the Company is profitable; the Company notes that Association negotiator Gould described Par. A.3 after its negotiation as a "meet and discuss" provision. The Company says that any ambiguity in the meaning of Par. A.3 should be construed strictly against the drafter of the language which was the Association.

The Company says that the Association is seeking an interpretation of Par. A.3 which would require it to agree to a pay increase whose magnitude would be determined on the basis of business conditions; the Company says that such an interpretation would constitute an ultra vires amendment to the collective bargaining agreement.

The Company contends that the Association has not shown that the Company acted or negotiated in bad faith. The Company says that saying "no" to the Association's request and/or declining to make an offer is not evidence of bad faith, and that the Company may refuse to grant a pay increase based on business conditions.

The Company notes that the Railway Labor Act does not require it to make an offer or reach an agreement in bargaining. The Company cites judicial language stating that its obligation is to "exert every reasonable effort to make and maintain agreements". The Company says that the size of one party's demands nor the distance between the parties after a long period of negotiations nor a party's refusal to capitulate to a demand for an interim wage increase establishes bad faith bargaining.

The Company further says that it made an offer for an immediate upward pay adjustment under Par. A.3 in exchange for modification of the collective bargaining agreement's vacation rules, and that the increased payroll costs would have been partially offset by changes to the vacation rules. The Company says that the Association was free to accept that offer which would have increased the pilots' then-existing wage rates.

The Company contends that the Association cannot make up its own unilateral definition of business conditions and then limit business conditions to those defined by the Association. The Company notes that there exists no definition of business conditions in either the collective bargaining agreement or LOA 67. The Company says that relevant business conditions from its perspective include risks associated with the ongoing Sec. 6 negotiations which may result in higher costs for the Company without any savings in pilot productivity and efficiency. The Company says that other business conditions include risks cited in the June 30, 2016 meeting with the Association and those cited in the Company's S-1 Form filing with the SEC. The Company says that its ability to pay a wage increase when it is financially successful is not the only relevant business condition. The Company says that one of its goals is to avoid the boom and bust cycle in the airline industry.

13

The Company says that the Association cannot rely on testimony from its expert witness, Kye Johanning, to establish that business conditions require an upward adjustment in pilot pay. The Company says that Mr. Johanning's testimony is irrelevant inasmuch as the Company has not argued that it is unable to afford a pay increase; rather, it has argued that it is unwilling to grant a pay increase. The Company also says that Mr. Johanning's testimony should be disregarded because it constitutes opinion evidence from a lay person and should further be disregarded to the extent that Mr. Johanning seeks to define business conditions from an Association perspective.

The Company finds fault with most of Mr. Johanning's testimony; it says that no evidence exists that a forecast based on gross domestic product (GDP) has a strong tie to airline revenues; it further says that its pre-tax profit margins are the lowest in the ultra low cost carrier (ULCC) market; that its passenger revenue per average seat mile (PRASM) has not seen positive growth; and that its cost per average seat mile (CASM) is higher than Spirit's, its chief competitor in the ULCC market.

The Company argues that the Association cannot sustain a bargaining in bad faith allegation based on the Company's failure to provide information. The Company says that no requirement exists in LOA 67 or in the collective bargaining agreement that it must provide information in support of its position. The Company says that courts have held that the Railway Labor Act in contrast to the National Labor Relations Act does not compel air carriers to provide documents or information during negotiations. Further, the Company says that it provided the Association with information regarding business conditions during the meeting on June 30, 2016 and that it further informed the Association that much of the requested information was also available on Form 41 filed with the US Department of Transportation. The Company also says that on March 31, 2017 it filed a Form S-1 with the SEC which contains detailed information regarding the Company's business, finances and risks. The Company says that the Association has all the information it needs regarding the Company's financial condition.

The Company argues that the Association's own bad faith in negotiations precludes any finding that the Company negotiated in bad faith. The Company points out that Section 6 negotiations for a successor collective bargaining agreement overlapped the negotiations regarding an LOA 67 pay increase, and that both matters were sometimes discussed during the same negotiations. The Company says that since the Section 6 negotiations began in March 2016, it has stressed the importance of improvements to pilot productivity and efficiency and that it has informed the Association that if the Association agrees to improvements in pilot productivity and efficiency, the Company will pay pilots more. The Company says that the Association has been completely unreceptive to its proposals, and that the negotiations took an ugly turn with some name-calling by the Association. The Company says that the Association's position, as expressed to the Company, was that "You're going to pay us and you're going to pay us big, and we are not going to <make> any changes to our work rules….and that's just how it's going to be, so get over it." The Company further says that after receiving the Association's proposal with respect to Par. A.3, the Company requested the Association's proposals regarding pay rates, work rules, and benefits in the Section 6 negotiations, and that the Association refused to provide such information.

The Company argues that the arbitration panel may not base its decision on notions of needs fairness. The Company says that the remaining anticipated arguments by the Association fail to establish any violation of LOA 67. The Company contends that the Association is asking the System Board to grant the Association what it failed to achieve in bargaining with respect to LOA 67.

In sum, the Company asks that the grievance be denied.

<u>Analysis</u>

The question presented is whether Frontier violated Par. A.3 of LOA 67 which requires it to "negotiate in good faith for further upward pay adjustments based on business conditions".

15

The parties have a disagreement over what it means to "negotiate in good faith" and what the term "business conditions" embraces.

I shall commence with a discussion about the meaning and scope of the term "business conditions". The parties have not defined the term "business conditions" either in LOA 67 or in their existing collective bargaining agreement. The Company's view is that the term "business conditions" is broad enough to permit it to consider projected labor costs and potential efficiencies/savings that might be derived from changed work rules; the Association's view is that the term "business conditions" does not extend as far as the Company asserts but, rather, pertains to corporate financial performance as detailed in income or profit & loss statements, cash flow reports, and corporate balance sheets.

It is not readily apparent why the term "business conditions" is not broad enough to include projected labor costs and savings that might be derived from changed work rules. After all, labor costs definitely comprise line items on profit and loss statements carrying significant impact for corporate financial performance in the airline industry. It certainly is logical that a Company negotiator would want to consider the impact of labor costs and potential efficiencies on its bottom line when that negotiator crafts proposals in labor negotiations.

Here, we have a situation where the LOA 67 and Section 6 negotiations took place concurrently – a phenomenon which the parties anticipated as a possibility when they crafted their contractual arrangements years earlier. In the negotiations over an "upward pay adjustment" under LOA 67, the Company wanted to have some information about the scale of the labor costs it might be facing in the Section 6 negotiations, and, accordingly, it sought that information from the Association. The Association refused to provide such information stating that the information request did not fall within the scope of "business conditions". (See the Association's May 19, 2016 response as set forth in the Background Section of this decision.) For the reasons recited above I find that the better view is that labor costs and potential efficiencies do fall within the scope of "business

16

conditions", and that such information was properly requested by the Company in the LOA 67 negotiations.

I now turn to the larger question which is whether or not the Company failed to "negotiate in good faith for further upward pay adjustments". Negotiating in good faith is its obligation under Par. A.3 of LOA 67.

What does it mean to negotiate in good faith other than saying it is the obverse of negotiating in bad faith? To negotiate in good faith are words of art, and they do not arise under nor are they found in the statutory language of the Railway Labor Act (RLA). The Railway Labor Act's commandment is that the parties "exert every reasonable effort to make and maintain agreements". (See 45 USC 152). The parties did not choose to use the words contained in the RLA statute; rather, they chose to use the words "to negotiate in good faith" which are found in another labor code, Sec. 8(a)(5) of the National Labor Relations Act. Sec. 8(a)(5) imposes an obligation on labor and management "to negotiate in good faith".

There exists a substantial body of jurisprudence which fleshes out the meaning of negotiating in good faith. A distinction is drawn between surface bargaining (going through the motions of bargaining without a sincere attempt to resolve issues) and genuine bargaining. In National Labor Relations Board v. Reed & Prince Mfg. Co., 205 F.2d 131 (1953) the First Circuit Court of Appeals stated:

"The question is whether it is to be inferred from the totality of the employer's conduct that he went through the motions of negotiation as an elaborate pretense with no sincere desire to reach an agreement…." P. 134

The court goes on further to say:

"the Board may not 'sit in judgment upon the substantive terms of collective bargaining agreements.' But at the same time it seems clear that if the Board is not to be blinded by empty talk and by the mere surface motions of collective bargaining, it must take some cognizance of the reasonableness of the positions taken by the employer in the course of bargaining negotiations." P. 134

…

"In other words while the Board cannot force an employer to make a 'concession' on any specific issue or to adopt any particular

position, the employer is obliged to make some reasonable effort in some direction to compose his differences with the union ….” P. 138

With the foregoing standards in mind let us examine the LOA 67 negotiations. First, let us remember the background. Par. A.3 of LOA 67 was negotiated during financially troubled times in which the pilots agreed to make substantial pay and benefit sacrifices to save the airline from yet another bankruptcy or potential liquidation. Bryan Bedford, CEO of Frontier at the time, acknowledged in his testimony that the airline could not have been restructured without the participation of the pilots. Mr. Bedford further testified about his perspective in negotiating Par. A.3 with the Association; he stated:

“It would be a nice problem to have if, in fact, we were producing margins that were better than what was in the restructuring plan and, you know, could we then afford to share some of the – some of the wealth with the employees.” Tr. pp.137-8.

Next, let us look at the history of negotiations through the filing of the Association’s grievance in this case which alleged that the Company was not bargaining in good faith. In April 2016 the Association presented to the Company its pay proposal pursuant to Par. A.3 of LOA 67. The Association viewed its pay proposal as a bridge until new pay rates could be negotiated in Sec. 6 bargaining. The Association sought a pay increase valued at 28 million dollars.

The parties next met in joint session on June 6-7, 2016. The Company informed the Association that at that time it had no LOA 67 proposal to offer.

The parties met again in joint session on June 28-30, 2016. The Company initially indicated to the Association that it was still working on a LOA 67 proposal. Then, on June 30th, the Company made a power point presentation to the Association. The presentation centered around challenging business conditions the Company said it faced, and the Company ended the presentation with the statement that the Company

was unable to entertain any LOA 67 pay increases at that time.[3] The Association requested a copy of the Company's power point presentation, and the Company refused to provide it at that time. (See footnote 5 infra.) The Association also requested information/data which supported various assertions in the Company's power point presentation, and the Company refused to provide such information/data except for a one page copy of the fleet plan.

The foregoing was the extent of the parties' LOA 67 negotiations through the filing of the Association's grievance on August 8, 2016 alleging failure on the Company's part to negotiate in good faith. Based on the foregoing has the Company met its obligation to bargain in good faith?

The foregoing does not reveal any reasonable effort on the Company's part to explore ideas and potential solutions with the Association in a genuine attempt to reach a mutually satisfactory outcome; in fact, it does not reveal even a willingness on the Company's part at the time to give the Association a copy of its power point presentation (see again footnote 5 infra) and to share information/data on which the power point presentation was predicated.

What may be said about the Company's power point presentation on June 30, 2017? Did the power point presentation accurately reflect prevailing business conditions for the Company? I find that it did not, and that it was highly unbalanced and misleading. The persuasive evidence presented at the arbitration hearing portrayed a much different picture – there were far more positives than negatives; the persuasive evidence was as follows. Barry Biffle, CEO of Frontier, stated to the press during the time frame in question: "It's an exciting time for the company. We've made more money in the last 10 months than we've made in the previous 10 years combined." The

---

[3] On June 30, 2016 the Company stated that if the Association were to make a concession on vacation pay, it would put the money saved from vacation pay back into the pilot wage rate. This proposal, if adopted, would have resulted in a wage rate less than the snapback rate scheduled to take effect in early 2017 which understandably did not make it an attractive proposal to the Association. In essence, the Association was being asked to fund its own wage increase and then even receive less than 100 cents on the dollar. In any event, the reliable evidence indicated that the Company, when asked, stated that it did not consider this proposal an LOA 67 proposal, and that it did not have an LOA 67 proposal to offer.

Company's payment of bonuses to management pilots in 2016 ranging from $13,061 to $50,573 and payment of dividends to shareholders in 2016 of 108 million dollars and 165 million dollars in 2017 are further evidence that the Company was prospering. Also, Kye Johanning, the Association's Manager of Economic & Financial Analysis, gave a compelling presentation on national economic conditions[4] and relative air carrier financial strength. His research showed that Frontier had very strong pre-tax profit margins of 16.9% in 2015 and 18.4% in 2016 which were well above the US airline industry average. His presentation further showed that growth in the ULCC (ultra low cost carrier) market was accelerating and exceeding that of all other air carrier market segments; that Frontier had the second lowest cost per average seat mile (CASM) excluding fuel costs among all ULCC and legacy carriers; that Frontier had the largest percentage increase in capacity in 2016 among all the aforementioned carriers and that it averaged 20% in annual growth in capacity over the past three years; that it has the lowest captain and first officer narrow body pay rates among all the aforementioned carriers, and that such gap widens even further when profit-sharing and pension contributions are included; and that Frontier's liquidity as a percentage of revenue now leads all the aforementioned carriers.

Good faith negotiations require that each party endeavor to make accurate claims; in this case such obligation extends to the Company's claims about business conditions. As the US Supreme Court said in National Labor Relations Board v. Truitt Manufacturing Co., 350 US 149 (1956):

"Good faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some proof of its accuracy. And it would certainly not be farfetched for a trier of fact to reach the conclusion that bargaining lacks good faith when an employer

---

[4] His research showed that the US is now in its third longest economic expansion in US history, that job growth has been steady and healthy, that jet fuel, a significant cost item, is down substantially across the industry due to the substantial fall in oil prices and is expected to be less volatile for the near term rising only somewhat from present levels., and that passenger revenue per average seat mile (PRASM) is expected to continue to grow in the second half of 2017.

mechanically repeats a claim of inability to pay without making the slightest effort to substantiate the claim. Such has been the holding of the Labor Board since shortly after the passage of the Wagner Act." Pp. 152-3

When the Company makes a power point presentation in bargaining and then refuses to provide the Association with a copy of that presentation at that time,[5] refuses to provide, in response to an Association request, information/data on which the power point presentation is predicated, and it is the case that the power point presentation is highly unbalanced and misleading,[6] I am at a loss to understand how that could be viewed as good faith bargaining in light of the precedent cited above.[7]

There is a final point that requires consideration. The Association has complained that the Company has failed to fulfill any of the Association's information requests; the Association believes that this also evidences bad faith bargaining on the part of the Company. The Association is seeking an order that the Company be compelled to produce relevant financial information such as audited financial statements, a fleet plan, a long-term business plan, a balance sheet, and cash flow statements.

As it happens, the Company has filed a Form S-1 with the SEC in preparation for a public stock offering, and that Form S-1 together with the DOT Forms 41 that the Company has filed provide a reasonably comprehensive financial portrait of the Company's operations. While I encourage the parties to exchange relevant information in their LOA 67 negotiations, I am not going to mandate the exchange of such information given the fact that an abundance of such information now

---

[5] The Association now has a written statement covering most of this presentation. (See the attachments to Michelle Zeier's letter, dated August 15, 2016, responding to the Association's grievance, and see also Mr. Scully's letter to Mr. Babcock dated March 28, 2017.)

[6] Consider, for example, the content of the Company's negative power point presentation against the content of the balanced, if not positive, S-1 filed by the Company. (An S-1 filing is a filing with the SEC preparatory to a stock offering.)

[7] Suppose, for example, that the Company wanted to engage the pilots in bargaining over a restructuring to save the Company. Would the Company proceed by presenting information that is highly unbalanced and misleading and by refusing to provide information/data backing up its presentation? I don't think so.

exists both as a result of the various filings referenced above as well as the record made in this case.

In sum, then, I find that the Company has violated Par. A.3 of LOA 67 through its failure to date to bargain in good faith over "upward pay adjustments" for pilots based on business conditions.

In terms of remedy I have spoken both to the issue of bargaining in good faith as well as to the issue surrounding the definition of "business conditions". Given my analysis with respect to the foregoing issues I believe that both parties have an obligation going forward to bargain in good faith pursuant to the precepts contained in this decision and pursuant to the requirements of Par. A.3 of LOA 67, and I shall so order.

The System Board shall retain jurisdiction for a period of days from the date of this decision for the purpose of resolving any dispute arising out of the remedy ordered herein.


                        Lawrence T. Holden, Jr.
                             Arbitrator